UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

K.O., an individual,                                        Case No. 22-11450

     Plaintiff,                                        F. Kay Behm
v.                                                                       United States District Judge

G6 Hospitality, LLC; Warren Economy
Hotel, Inc. d/b/a Motel 6 of Warren;
Marriott International, Inc.;
Farmington Hospitality, Inc. d/b/a
Fairfield Inn & Suites Detroit
Farmington Hills; Knights Franchise
Systems, Inc.; Holiday Hospitality
Franchising LLC; Southfield Hotel
Suites, Inc. d/b/a Holiday Inn Express &
Suites; Akram Namou d/b/a Knight's
Inn Sterling Heights, and d/b/a Holiday
Inn Express & Suites Southfield
Detroit; ESA Management,
LLC d/b/a Extended Stay America
Detroit Canton, d/b/a Extended Stay
America Detroit Southfield
Northwestern Highway, and d/b/a
Extended Stay America Detroit
Southfield I-696; and Red Roof Inns,
Inc.,

     Defendants.
_____ /

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS TO DISMISS (ECF Nos. 106, 108, 111, 112, 113)**

## I.     INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff, K.O.,[1] brings this action against a number of hotel chains located in

the Southeast Michigan region, alleging they are either directly, indirectly, or

vicariously liable for her sex trafficking in violation of the William Wilberforce

Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA").  (ECF No. 1).

K.O. alleges she first met her trafficker in 2003 when he, "under the guise of

seeking a romantic relationship, began dating her before turning violent and

selling her to buyers for sex."  (ECF No. 96, PageID.1143).  K.O. alleges she was

trafficked from 2003 until 2014 and was regularly "forced to sexually service

paying strangers while enduring brutal physical and emotional abuse at the hands

of her trafficker while at the hotels owned, operated, supervised, franchised,

and/or branded by Defendants."  *Id.*  K.O. alleges her trafficker engaged in a

repetitive process which included paying for rooms in cash; paying for extended

stays on a day-to-day basis; requesting special rooms, including rooms in more

secluded areas or by exits, and late checkout; soliciting buyers in and around the

---

[1] "Courts in cases that involve victims of sex traffickers routinely allow plaintiffs, at least at the early stages of litigation, to proceed under a pseudonym due to the sensitive and intimate nature of their allegations."  *H.G. v. Inter-Cont'l Hotels Corp.*, 489 F. Supp. 3d 697, 713 (E.D. Mich. 2020) (citing *B.M. v. Wyndham Hotels & Resorts, Inc.*, No. 20-CV-00656-BLF, 2020 WL 4368214, at *3 (N.D. Cal. July 30, 2020)).

hotels' lobbies and parking lots; and using the hotels' Wi-Fi to post additional advertisements for commercial sex.  *Id.*, PageID.1188-89.

In her third amended complaint (TAC), K.O. brings a single count against the Defendants for a violation of § 1595 of the TVPRA (Count I).  *Id.*, PageId.1244.  The Defendants include G6 Hospitality, LLC ("G6"); Warren Economy Hotel, Inc. d/b/a Motel 6 of Warren ("Warren Economy"); Marriott International, Inc. ("Marriott"); Farmington Hospitality, Inc. d/b/a Fairfield Inn & Suites Detroit Farmington Hills ("Farmington Hospitality"): Knights Franchise Systems, Inc. ("Knights"); Holiday Hospitality Franchising LLC ("Holiday"); Southfield Hotel Suites, Inc. d/b/a Holiday Inn Express & Suites ("Southfield"); Akram Namou d/b/a Knights Inn Sterling Heights and d/b/a Holiday Inn Express & Suites Southfield Detroit ("Namou"); ESA Management, LLC d/b/a Extended Stay America Detroit Canton, d/b/a Extended Stay America Detroit Southfield Northwestern Highway, and d/b/a Extended Stay America Detroit Southfield I-696 ("ESA Management"); and Red Roof Inns, Inc. ("Red Roof").  The court is presently considering five separate motions to dismiss: (1) ECF No. 106, filed by Defendant Knights; (2) ECF No. 108, filed by Defendant Marriott and concurred in by Defendant G6; (3) ECF No. 111, filed by Defendant Red Roof; (4) ECF No. 112, filed by Defendant ESA Management; and (5) ECF No. 113, filed by Defendant Holiday and concurred in by Defendants Farmington

Hospitality, Southfield, and Warren Economy.  The only party not directly

participating in these motions to dismiss is Defendant Namou.  These motions

have all been fully briefed.  (*See* ECF Nos. 106, 108, 110, 111, 112, 113, 116, 117,

118, 119, 120, 121, 122, 123, 124, 125, 126, 130, 131).  The court held a hearing

on all five motions on October 25, 2023, and each party was given an opportunity

to make their relevant arguments on the record.  (*See* ECF No. 114).  For the

reasons stated below, the court **GRANTS** Defendants' motions to dismiss as they

relate to the claims brought against Defendants G6, Warren Economy, Marriott,

Knights, Namou, Holiday, Southfield, ESA Management, and Red Roof.

Defendants' motions to dismiss as they relate to the claims brought against

Defendant Farmington Hospitality are **DENIED.**

## II.    PARTIES

This case involves allegations that K.O. was trafficked at approximately 12

different hotels in Southeast Michigan, owned and operated by approximately

five different parent companies and five different franchisees.  (ECF No. 96,

PageID.1144-84).  Defendant G6 "directly and through its franchisee Defendant

[Warren Economy] offered public lodging services at the Motel 6 Warren,

Michigan – Detroit East and the Motel 6 Madison Heights, Michigan – Detroit

Northwest."  *Id.*, PageID.1144.  Defendant G6 directly owned and operated the

Motel 6 Warren, Michigan – Detroit East until 2011, at which time they franchised this property to Defendant Warren Economy.  *Id.*, PageID.1145.  Defendant G6 directly owned and operated the Motel 6 Madison Heights, Michigan – Detroit Northeast at all times relevant to this case.  *Id.*  Defendant Marriott, through its franchisee Defendant Farmington Hospitality, operated the Fairfield Inn & Suites by Marriott Detroit Farmington Hills at all times relevant to this case.  *Id.*, PageID.1155.  Defendant Knights, "directly and through its franchise agreement with Defendant [Namou] offered public lodging services at the Knight's [sic] Inn Sterling Heights" at all times relevant to this case.  *Id.*, PageID.1161.  Defendant Holiday operated the Holiday Inn Express & Suites Southfield Detroit through two different franchisees: Defendant Namou from August 2006 through January 2007, and Defendant Southfield from January 2007 through 2014.  *Id.*, PageID.1164. Defendant ESA Management operated three hotels as a franchisee of non-Defendant ESA, Inc.[2] at all times relevant to this case: the Extended Stay America Detroit Canton, the Extended Stay America Detroit Southfield Northwestern Highway, and the Extended Stay America Detroit Southfield I-696.  *Id.*, PageID.1176.  Finally, Defendant Red Roof "own[ed], supervise[d], manage[d],

---

[2] ESA Inc. was initially included as a defendant in this case, but was removed when Plaintiff filed her third amended complaint on April 3, 2023.  (ECF No. 96).

control[ed], operat[ed], and/or franchise[d]" four separate hotels at all times

relevant to this case: the Red Roof Inn Detroit – Plymouth/Canton, the Red Roof

Inn Detroit – Royal Oak Madison Heights, the Red Roof Inn Ann Arbor – University

of Michigan South, and the Red Roof PLUS+ Ann Arbor – University of Michigan

North. *Id.*, PageID.1179-80.  The following chart visualizes the Defendant owners,

franchisees, and their relevant hotels:

| PARENT COMPANY | FRANCHISEE(S) | HOTELS |
|---|---|---|
| Defendant G6 | Defendant Warren Economy (2011 – present) | - Motel 6 Warren Michigan – Detroit East |
| | *[N/A]* | - Motel 6 Madison Heights Michigan – Detroit Northeast |
| Defendant Marriott | Defendant Farmington Hospitality | - Fairfield Inn & Suites by Marriott Detroit Farmington Hills |
| Defendant Knights | Defendant Namou | - Knights Inn Sterling Heights |
| Defendant Holiday | Defendant Namou (2006-2007); Defendant Southfield (2007-2014) | - Holiday Inn Express & Suites Southfield Detroit |
| *[Non-Defendant ESA Inc.]* | Defendant ESA Management | - Extended Stay America Detroit Canton<br>- Extended Stay America Detroit Southfield Northwestern Highway<br>- Extended Stay America Detroit Southfield I-696 |
| Defendant Red Roof | *[No Defendant Franchisees included]* | - Red Roof Inn – Plymouth/Canton<br>- Red Roof Inn Detroit – Royal Oak Madison Heights<br>- Red Roof Inn Ann Arbor – University of Michigan South<br>- Red Roof PLUS+ Ann Arbor – University of Michigan North |

### III.   RELEVANT LEGAL STANDARDS

#### A.   Federal Rule of Civil Procedure 12(b)(6)

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court

must "construe the complaint in the light most favorable to the [nonmoving

party] ... [and] accept all well-pled factual allegations as true*." League of United

Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007); *see also Yuhasz*

*v. Brush Wellman, Inc*., 341 F.3d 559, 562 (6th Cir. 2003).  The complaint must

provide "'a short and plain statement of the claim showing that the pleader is

entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is

and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Moreover, the

complaint must "contain[] sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677

(2009).  A claim has "facial plausibility" when the nonmoving party pleads facts

that "allow[] the court to draw the reasonable inference that the [moving party] is

liable for the misconduct alleged." *Id*. at 678.  While the standard in Rule 12(b)(6)

is liberal, it requires more than bare assertions of legal conclusions, and

"[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *H.G. v. Inter-Cont'l Hotels Corp.*, 489 F. Supp. 3d 697, 703 (E.D. Mich. 2020) (citing *Iqbal*, 556 U.S. at 678).

In evaluating the allegations in the complaint, the court must be mindful of its limited task when presented with a motion to dismiss under Rule 12(b)(6). At the motion to dismiss stage, the court does not consider whether the factual allegations are probably true; instead the court must accept the factual allegations as true, even when skeptical. *See Twombly*, 550 U.S. at 555 (a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"); *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"). Indeed, in assessing the sufficiency of a complaint, the court must determine only whether "'the claimant is entitled to offer evidence to support the claims,' not whether the plaintiff can ultimately prove the facts alleged." *See United States v. SouthEast Eye Specialists, PLLC*, 570 F. Supp. 3d 561, 574 (M.D. Tenn. 2021) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)).

B.   The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA)

When first enacted in 2000, the TVPRA was intended to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims."  Pub. L. No. 106-386, 114 Stat. 1464 (2000).  The TVPRA did not initially include a private right of action and was limited to criminal prosecution.  *Id.*  The criminal provision, 18 U.S.C. § 1591, states:

> (a) Whoever knowingly –
>
> > (1) in or affecting interstate or foreign commerce,…recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
> >
> > (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be

> caused to engage in a commercial sex act, shall be
> punished as provided in subsection (b).

18 U.S.C. § 1591(a).  In 2003, Congress amended the TVPRA and "established a

civil remedy for victims of various forms of trafficking violations."  *H.G.*, 489 F.

Supp. 3d at 703 (citing *Griffin v. Alamo*, No. 4:14-CV-4065, 2016 WL 7391046, at

*2 (W.D. Ark. Dec. 21, 2016)).  On December 23, 2008, Congress again amended

the TVPRA, adding a "financial beneficiary prong," which "allows victims to

recover similar relief from those who knowingly benefit, financially or otherwise,

from a violation of the TVPRA."  *Id.*  The standard for civil liability, 18 U.S.C.

§ 1595, now states:

> (a) An individual who is a victim of a violation of this
> chapter may bring a civil action against the perpetrator
> (**or whoever knowingly benefits, or attempts or
> conspires to benefit, financially or by receiving
> anything of value from participation in a venture which
> that person knew or should have known has engaged
> in an act in violation of this chapter**) in an appropriate
> district court of the United States and may recover
> damages and reasonable attorneys fees.

15 U.S.C. § 1595(a) (emphasis added).  The parties do not appear to contest that

K.O. is, for purposes of the statute, a "victim" under 18 U.S.C. § 1591.

Additionally, because K.O. does not allege that any of the Defendants were the

direct perpetrators of her sex trafficking, she seeks relief under the "financial

beneficiary prong" of the statute.

The "financial beneficiary" language of § 1595(a) can be broken down into three key elements: "(1) [] the defendant 'knowingly benefit[ted],' (2) 'from participation in a venture,' (3) 'which [the defendant] knew or should have known has engaged' in sex trafficking." *H.G.*, 489 F. Supp. 3d at 704 (citing 18 U.S.C. § 1595(a)).  A plaintiff may bring a claim under § 1595(a) alleging either direct liability or indirect liability.

## IV.   ANALYSIS

While each of the individual Defendants' motions are distinct, they generally present five main arguments for dismissal pursuant to Rule 12(b)(6): (1) because the TVPRA cannot apply retroactively, K.O. may only bring claims under the civil remedy provision of the TVPRA that occurred after December 23, 2008; (2) K.O.'s claims are barred by the TVPRA's 10-year statute of limitations; (3) K.O. has engaged in impermissible shotgun pleading; (4) K.O. fails to allege that Defendants participated in a sex trafficking "venture" under the TVPRA; and (5) K.O. fails to sufficiently allege vicarious liability and an agency relationship on behalf of the hotel chains.  The court will address each of these arguments in turn, noting which parties raised them across the various motions.

A.   <u>Time-Barred Claims</u>

The court will first address the timeliness of K.O.'s claims.  Defendants ESA

Management and Holiday argue the TVPRA's ten-year statute of limitations bars a

large portion of her relevant claims, and they should be dismissed as a result.

(ECF No. 112, PageID.1649; ECF No. 113; PageID.1687).  The TVPRA explicitly

states "no action may be maintained under subsection (a) unless it is commenced

not later than the later of … 10 years after the cause of action arose; or (2) 10

years after the victim reaches 18 years of age, if the victim was a minor at the

time of the alleged offense."  18 U.S.C. § 1595(c).  K.O. does not allege she was

under the age of 18 at any time relevant to the underlying claims.  As such, she

may only pursue claims for violations of the TVPRA that occurred in the ten years

prior to the filing of her complaint.  K.O. has filed several amended complaints

over the course of this litigation, each adding and removing different Defendants.

(*See* ECF No. 1, 5, 33, 96).  Therefore, the statutes of limitations differ based on

when the relevant Defendants were added to the lawsuit.  K.O.'s initial complaint

was filed against only Red Lion Hotels, who is no longer a defendant in this case.

(ECF No. 1).  K.O.'s first amended complaint (FAC), filed on August 15, 2022,

added Defendants G6, Marriott, Red Roof, and Holiday.  (ECF No. 5).  As such, K.O.

may bring claims against these Defendants that arose between August 15, 2012

and August 15, 2022.  K.O.'s second amended complaint (SAC), filed on November 18, 2022, added Defendants Warren Economy, Farmington Hospitality, Knights, Southfield, and Namou.  (ECF No. 33).  As such, K.O. may bring claims against these Defendants that arose between November 18, 2012 and November 18, 2022.  K.O.'s TAC, filed on April 3, 2023, added Defendant ESA Management.  (ECF No. 96).  As such, K.O. may bring claims against Defendant ESA Management that arose between April 3, 2013 and April 3, 2023.

K.O. alleges that she was trafficked at each of the Defendants' hotels "between 2003 and 2014."  (ECF No. 96, PageID.1143).  She expands on these allegations and argues she was trafficked at each of the individual hotels during the following time periods:

| HOTEL | ALLEGED OFFENSE DATES |
|---|---|
| Motel 6 Madison Heights Michigan – Detroit Northeast (Defendant G6) | "From 2003 to 2014" (ECF No. 96, PageID.1191) |
| Motel 6 Warren Michigan – Detroit East (Defendant G6 and Warren Economy) | "…from 2003 through 2012; this occurred approximately once per month" (ECF No. 96, PageID.1191) |
| Fairfield Inn & Suites by Marriott Detroit Farmington Hills (Defendant Farmington Hospitality) | Frequently "from 2003 through 2014" (ECF No. 96, PageID.1191) |
| Knights Inn Sterling Heights (Defendants Knights and Namou) | "From 2003 to 2014" (ECF No. 96, PageID.1192) |
| Holiday Inn Express & Suites Southfield Detroit (Defendants Holiday, Namou, and Southfield) | "Beginning in 2003" (ECF No. 96, PageID.1193) |
| Extended Stay America Detroit Canton (Defendant ESA Management) | "Commencing in approximately 2005 through 2014" (ECF No. 96, PageID.1193) |

| HOTEL | ALLEGED OFFENSE DATES |
|---|---|
| Extended Stay America Detroit Southfield Northwestern Highway (Defendant ESA Management) | "Commencing in approximately 2005 through 2014" (ECF No. 96, PageID.1193) |
| Extended Stay America Detroit Southfield I-696 (Defendant ESA Management) | "Commencing in approximately 2005 through 2014" (ECF No. 96, PageID.1193) |
| Plymouth/Canton Red Roof Inn (Defendant Red Roof) | "So often…she considered this her home" and "from 2003 to 2013" (ECF No. 96, PageID.1194) |
| Red Roof Inn Detroit – Royal Oak Madison Heights (Defendant Red Roof) | "Between 2011 and 2014" (ECF No. 96, PageID.1194) |
| Red Roof Inn Ann Arbor – University of Michigan South (Defendant Red Roof) | *No specific time period allegations* |
| Red Roof PLUS+ Ann Arbor – University of Michigan North (Defendant Red Roof) | "Between 2011 and 2014" (ECF No. 96, PageID.1194) |

As K.O.'s claims reveal, the bulk of her trafficking occurred more than 10 years

before she filed her complaints.  As such, all claims outside of the relevant 10-year

time period are time-barred based on the statute of limitations.[3]

---

[3] Defendants Marriott, ESA Management, and Holiday also argue that a large portion of Plaintiff's claims are similarly barred because the civil remedy provision does not apply retroactively.  (ECF No. 108, PageID.1142; ECF No. 112, PageID.1647; ECF No. 113, PageID.1696).  Generally, there is a strong presumption that a statute does not apply retroactively, "'unless Congress has made clear its intent' that the statute should be retroactive."  *H.G.*, 489 F. Supp. 3d at 710 (citing *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994)).  The "financial benefit" prong of the TVPRA was enacted on December 23, 2008. *Id.*  The statute does not include any language addressing liability for actions that occurred prior to its enactment, and courts have generally held that "the amendment is not retroactive and does not create liability for actions prior to December 23, 2008." *Id.* (citing *Griffin*, 2016 WL 7391046, at *1); *St. Louis v. Perlitz*, No. 3:13-CV-1132 (RNC), 2016 WL 1408076, at *1 (D. Conn. Apr. 8, 2016)).  As such, while these claims are already time-barred by the statute of limitations, K.O. cannot bring any claims under the TVPRA for trafficking that allegedly occurred prior to December 23, 2008.

B.    <u>"Shotgun Pleading"</u>

Defendants Knights, Marriott, ESA Management, and Holiday each argue

that "[K.O.'s] Third Amended Complaint violates the 'shotgun' pleading rule by

pervasively lumping multiple Defendants together in a conclusory fashion,

treating separate Defendants as a single entity, without sufficient allegations to

support such treatment, and without lodging specific allegations against each

Defendant so that each may be clear as to what it is being sued for."  (ECF No.

106, PageID.1355-56; *see also* ECF No. 108, PageID.1441; ECF No. 112,

PageID.1640; ECF No. 113, PageID.1696).  A "shotgun pleading" is one that makes

it "virtually impossible for a defendant to know which allegations of fact are

intended to support which claims for relief."  *Arnold v. CooperSurgical, Inc.*, No.

2:22-CV-1951, 2023 WL 4552154, at *13 (S.D. Ohio July 10, 2023) (collecting

cases).  Shotgun pleadings often "seek to overwhelm defendants with an unclear

mass of allegations and make it difficult [or] impossible for the defendants to

make informed responses to the plaintiff's allegations."  *A.B. v. Hilton Worldwide

Holdings Inc.*, 484 F. Supp. 3d 921, 943 (D. Or. 2020) (citing *Autobidmaster, LLC v.

Alpine Auto Gallery, LLC*, No. 3:14-cv-1083-AC, 2015 WL 2381611, at *15 (D. Or.

May 18, 2015)).  When a party argues that a complaint is an impermissible

shotgun pleading as part of their 12(b)(6) motion to dismiss, the court must

determine whether the complaint violates the Federal Rules of Civil Procedure.

*Id*. (citing *Lee v. Ohio Educ. Ass'n*, 951 F.3d 386, 392 (6th Cir. 2020)).  For instance,

Rule 8(a)(2) requires a plaintiff to provide the defendants with "adequate notice

of the claims against them and the grounds upon which each claim rests."  *Lee*,

951 F.3d at 392-93 (citing *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th

Cir. 2018) (quoting *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313,

1323 (11th Cir. 2015))).

K.O.'s TAC raises a series of general allegations about sex trafficking as a

national concern, including the "crucial role" of the hospitality industry.  (ECF No.

96, PageID.1194-1204).  Additionally, the TAC includes a long list of alleged "open

and obvious" signs of sex trafficking that were present at each of the hotels,

including:

> cash payments for rooms; frequent foot traffic to and
> from the rooms; signs of sex trafficking in rooms e.g.
> excessive condoms, lubricant, 'do not disturb' signs
> being constantly hung on doors rented by sex traffickers;
> women arriving to hotels and being checked in with
> their trafficker with little to no personal possessions;
> women arriving with signs of physical abuse; women
> arriving at the hotel who appear fearful or anxious; and
> refusing cleaning services for days.

*Id.*, PageID.1148, 1149, 1154, 1157, 1160, 1163, 1167, 1170, 1172, 1175, 1178,

1183.  K.O also includes a similar list of general "red flags and direct employee

interactions" which she argues "alerted or should have alerted Defendants to her

trafficking at their branded hotels," including but not limited to:

> i. Paying for rooms in cash;
> ii. Paying for extended stays on a day-to-day basis;
> iii. Requesting special rooms, including rooms in more secluded areas or by exits or late check out;
> iv. Plaintiff's physical appearance, including being malnourished, bruised, beaten, drugged, with visible cigarette burns, and clothed with attire inappropriate for the weather;
> v. Plaintiff and Plaintiff's trafficker's behavior, including the trafficker's complete control over Plaintiff, her ID, and her money;
> vi. Plaintiff's trafficker's solicitation of buyers in and around the Defendants' branded hotels, including the lobby and parking lot;
> vii. Using Defendants' Wi-Fi to post advertisements for commercial sex;
> viii. Continuous processions of unregistered buyers entering and exiting the rooms;
> ix. Indicia of commercial sex within the room, including an inordinate number of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels;
> x. Obvious signs of illegal drug use;
> xi. Excessive requests for sheets, cleaning supplies, and room service;
> xii. Extraordinary violence and loud disturbances in common and public hotel areas;
> xiii. Audible pleas to branded hotel staff and guests for help;
> xiv. Hotel guest complaints;
> xv. Direct employee encounters and witness accounts of Plaintiff's suffering in and around Defendants' branded hotels' premises; and

xvi. Online reviews indicating the prevalence of sex
trafficking and criminal activity at Defendants' owned,
operated, branded, or franchised hotels.

*Id.*, PageID.1188-89.

Courts presented with similar arguments about shotgun pleading have

generally declined to dismiss the complaint on that basis alone.  *See S.Y. v.*

*Wyndham Hotels & Resorts, Inc.*, 519 F. Supp. 3d 1069, 1078 (M.D. Fla. 2021)

(citing *Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000) ("The failure to

specify a particular defendant is not fatal, however, when '[t]he complaint can be

fairly read to aver that all defendants are responsible for the alleged conduct.'");

*J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1075 (D. Colo. 2021) ("And because

all of the plaintiff's claims have essentially the same factual underpinning, the

Court is not persuaded that this is a case where incorporating prior allegations

into each claim makes the claim unintelligible.").  The court agrees that the

inclusion of these broad allegations, when combined with other more specific

facts about each location, does not alone merit the dismissal of this case.  Fed. R.

Civ. P. 8(a)(2).  However, in turning to the arguments about the viability of K.O.'s

TVPRA claims, the court will pay special attention to the *specific* allegations raised

about her trafficking at each of the individual Defendant hotels to determine

whether they are sufficient to "give the defendant fair notice" of the claims against them.  *See Twombly*, 550 U.S. at 545.

      C.    <u>Standards for TVPRA Claims</u>

As to all remaining claims occurring between approximately 2012 and 2014, the key question is whether the Defendants can be held liable under the financial beneficiary prong of 18 U.S.C. § 1595(a).  As an initial note, there is little binding precedent to guide the court's consideration of these claims, and many of the decisions issued by District Courts within this circuit, as well as those across the country, have reached widely different results based on the standards and their application to the unique facts of each case.  *See L.H. v. Red Roof Inn, Inc.*, No. 3:22-CV-625-CHB, 2023 WL 5725574, at *5 (W.D. Ky. Sept. 5, 2023) (citing *J.M. v. Choice Hotels Int'l, Inc.*, No. 2:22-CV-00672-KJM-JDP, 2022 WL 10626493, at *1 (E.D. Cal. Oct. 18, 2022) ("[F]ederal district courts across the country are tackling these suits and interpreting the TVPRA on a case-by-case basis.")).

Courts in this circuit have generally utilized a three-part test, which asks whether the defendant meets each of the essential elements of a claim under § 1595(a): (1) knowingly benefitted, (2) from participation in a venture, (3) which the defendant knew or should have known has engaged in sex trafficking.  *H.G.*, 489 F. Supp. 3d at 704.  A recent case decided by the Seventh Circuit, *G.G. v.*

*Salesforce.com, Inc.*, reorganized these elements to form a more "logical sequence," asking instead whether: "(1) a venture has engaged in an act in violation of Section 1591, (2) the defendant knew or should have known that the venture had violated Section 1591, (3) the defendant participated in that venture, and (4) the defendant knowingly benefited from its participation." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553 (7th Cir. 2023). However, because this case is not binding on the court, and its mere reorganization of the factors does not lead to a substantially different result, the court will continue to rely on the three-factor test, informing its analysis of each of these factors using caselaw from both courts in this circuit and across the country.

> i.    *Knowing Benefit*

The first element merely requires a plaintiff to plausibly allege that a defendant "knowingly receive[d] a financial benefit" in some way from its participation in the venture. *T.E. v. Wyndham Hotels & Resorts, Inc.*, No. 2:22-CV-3185, 2024 WL 474400, at *4 (S.D. Ohio Feb. 7, 2024) (the first element "merely requires that [a defendant] knowingly receives a financial benefit, not that the perpetrator have actual knowledge of the sex trafficking venture."); *see also A.C. v. Red Roof Inns, Inc.*, No. 2:19-CV-4965, 2020 WL 3256261, at *4 (S.D. Ohio June 16, 2020) ("Section § 1595(a) does not impose an actual knowledge

requirement.").  Courts have generally held that receipt of a fee from "the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element."  *A.C.*, 2020 WL 3256261, at *4; *see also J.G. v. Northbrook Indus., Inc.*, 619 F. Supp. 3d 1228, 1234 (N.D. Ga. 2022) (collecting cases) ("Several district courts, including this one, have found that the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard.").

### ii.    Participation in a Venture

The second element, "participation in a venture," asks whether there was "at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement."  *T.E.*, 2024 WL 474400, at *6 (citing *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 970 (S.D. Ohio 2019) (citing *Jean-Charles v. Perlitz*, 937 F. Supp. 2d 276, 287-88 (D. Conn. 2013))).  To meet this element, the plaintiff must first allege the existence of a venture, which need not specifically be a "sex trafficking venture," but instead may be a "commercial venture," such as running or expanding a business whose primary focus is not on sex trafficking.  *G.G.*, 76 F.4th at 554 (citing *Doe # 1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 727 (11th Cir. 2021)).

The plaintiff must also allege that the defendant did, in fact, "participate" in that venture.  While courts have found that "participation" under § 1595 does not require an "'overt act' in furtherance of the sex trafficking," a plaintiff must allege enough to "'connect the dots' between the plaintiff's particular experience and the specific defendant in the case." *J.G.*, 619 F. Supp. 3d at 1235 (citations omitted).  Plaintiffs can "connect the dots" under this factor in two key ways: (1) by alleging a "'direct association' between the defendant and the plaintiff's trafficker," and (2) by alleging a "'continuous business relationship' between the defendant and the plaintiff's trafficker based on the continuous rental of rooms to people it knew or should have known were engaged in sex trafficking." *J.G.*, 619 F. Supp. 3d at 1236; *H.H. v. G6 Hosp., LLC*, 2:19-CV-755, 2019 WL 6682152, at *4 (S.D. Ohio, Dec. 6, 2019) ("In the absence of a direct association, Plaintiff must allege at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement.").

Whether two parties have a "direct association" is often determined by looking to the explicit actions of staff members who directly aid traffickers, for example, by "acting as lookouts for Plaintiff's traffickers," "informing the

traffickers of police activity at the hotel," or "warning [traffickers] about guest complaints and high visitor traffic drawing unwanted attention." *Id.*  A number of courts have relied on the First Circuit's opinion in *Ricchio v. McLean* as an example of conduct that rises to the level of a "direct association" under this factor.  In *Ricchio*, the trafficker and the motel operator allegedly had prior commercial dealings and had "'exchang[ed] high-fives in the motel's parking lot while speaking about 'getting this thing going again,''" after it became clear that the trafficker was again engaging in "coercive and abusive treatment of [plaintiff] as a sex slave."  *K.H. v. Riti, Inc.*, No. 23-11682, 2025 WL 505063, at *3 (11th Cir. Feb. 9. 2024) (citing *Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017)).

Alternatively, a "continuous business relationship" occurs where there is a less obvious link between the trafficker and the defendant hotel.  Courts have found that a continuous business relationship can be shown using allegations of "repeated interactions" between the trafficker and hotel staff, including that staff had notice of sex trafficking occurring at their property but continued to rent rooms to the plaintiff's trafficker or failed to otherwise implement policies to prevent trafficking.  *See J.G.*, 619 F. Supp. 3d at 1236 (finding plaintiff sufficiently alleged a continuous business relationship where the defendants continued to rent rooms to her trafficker despite the "obvious signs, characteristics, and

behaviors of minor victims of sex trafficking.").  However, courts have also

cautioned that merely "observing [trafficking] is not the same as participating in

it."  *Doe # 1*, 21 F. 4th at 727 ("Their only allegations as to the franchisors'

knowledge or participation in those sex trafficking ventures are that the

franchisors sent inspectors to the hotels who would have seen signs of sex

trafficking and that they received reviews mentioning sex work occurring at the

hotels."); *A.B. v. H.K. Grp. of Co.*, No. 1:21-CV-1344-TCB, 2022 WL 467786, at *2

(N.D. Ga. Feb. 9, 2022) ("At most, Plaintiff's complaint contains conclusory

allegations that claim Defendants observed and/or had actual or constructive

knowledge of the illegality of sex trafficking allegedly occurring in its hotels.  By

failing to allege a common undertaking – between Defendants and the alleged

traffickers – involving risk or profit, Plaintiff's allegations do not support a TVPRA

civil claim.").  As such, while certain allegations about a defendant's interactions

with a plaintiff's trafficker will clearly rise to the level of "participation in the

venture," there is no bright line rule to follow, and the analysis under this factor

tends to be dependent on the unique facts and circumstances alleged in each

case.

### iii.    Knowledge that the venture violated the TVPRA

Finally, a plaintiff must allege that the defendant plausibly "knew or should have known" that the venture from which it benefitted has engaged in an act that violates § 1591 of the TVPRA.  *G.G.*, 76 F. 4th at 555.  The "knew or should have known" language indicates that this factor is analyzed under a negligence standard, and constructive knowledge of sex trafficking in violation of § 1591 is sufficient.  *J.L.*, 521 F. Supp. 3d at 1076 ("The knowledge requirement in § 1595 is not recklessness or actual knowledge, but rather negligence.") (citing *M.A.*, 425 F. Supp. 3d at 966 (Plaintiff "does not need to prove reckless disregard under [Section] 1595(a), only that the Defendants 'should have known' about the nature of the venture under a negligence standard [and] [t]his does not require evidence of actual knowledge or conspiracy between the Defendants and the trafficker.")). The focus is not on whether the defendant had knowledge of the specific plaintiff's experience, but instead on whether the defendant had constructive knowledge that the specific venture violated § 1591.  *G.G.*, 76 F.4th at 558 ("we agree with the majority of courts that have addressed Section 1595's constructive-knowledge requirement that the statutory text does not require allegations and ultimately proof that the defendant knew or should have known of the specific victim who has brought the civil action.").  However, when cases

25

involve the trafficking of only one victim, knowledge of the specific victim often "goes hand-in-glove with knowledge of the 'venture.'"  *Id.* at 557.

Additionally, general awareness that sex trafficking often occurs or has occurred in "low-budget hotels" is insufficient to show a defendant "should have known" that the particular venture was in violation of the TVPRA.  *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 155 (E.D.N.Y. 2020); *see also G.G.*, 76 F.4th at 557 ("to allow allegations that a civil defendant was aware of sporadic sex trafficking in low-budget hotels generally to show constructive knowledge of a particular sex trafficking venture 'unjustifiably bridges the scienter gap between should have known and might have been able to guess.'") (internal quotation marks omitted); *Doe # 1*, 21 F.4th at 725; *H.G.*, 489 F. Supp. 3d at 705 (knowledge that a hotel "is located in an area 'known for a high incidence of crime and prone to trafficking on and around the hotel premises'" or that "defendants were generally aware of sex trafficking…at some properties operating under their brand names" is insufficient to meet this prong).  As such, this factor is also heavily dependent on a case-by-case analysis of the facts, and a court must focus on whether a plaintiff has sufficiently alleged constructive knowledge of a non-generalized and non-sporadic "particular" venture at the hotel(s) in question. *G.G.*, 76 F.4th at 556-57.

C.    <u>Application</u>

The central argument of each of the Defendants' motions is that the TVPRA

claims against them should be dismissed for failure to state a claim pursuant to

Fed. R. Civ. P. 12(b)(6).  (*See* ECF Nos. 106, 108, 111, 112, 113).  K.O.'s complaint

brings claims against the Defendants that fall into three different "categories:" (1)

direct liability claims against "parent hotel brands," Defendants G6 and Red Roof;

(2) indirect liability claims against "parent hotel brands," Defendants G6, Marriott,

Knights, and Holiday, based on an agency theory; and (3) direct liability claims

against the hotel franchisees, Defendants Farmington Hospitality, Namou,

Southfield, and ESA Management.

*i.    Direct Liability Claims – Parent Hotel Brands*

K.O. brings direct liability claims against two specific "parent hotel brands,"

Defendant G6 and Defendant Red Roof.  (ECF No. 96, PageID.1210).  To bring a

direct liability claim, a plaintiff must satisfy each of the relevant elements by

showing that the "defendant's *own* acts, omissions, and state of mind establish

each element."  *B.D.G. v. Choice Hotels Int'l, Inc.*, No. 2:22-CV-3202, 2023 WL

5935646, at *3 (S.D. Ohio Sept. 12, 2023) (citing *J.L.*, 521 F. Supp. 3d at 1060)

(emphasis added).  Specifically, a plaintiff "must 'connect the dots' between her

and a franchisor to satisfy the 'participation in a venture' element and she must

27

allege more than 'general knowledge of sex trafficking problems in the hotel industry or even at defendants' franchisee hotels.'" *L.H.*, 2023 WL 5725574, at *6 (citing *J.M.*, 2022 WL 10626493, at *5).

1. *Defendant G6*

K.O. brings direct liability claims against Defendant G6 for her sex trafficking that occurred at both the Motel 6 Madison Heights, Michigan – Detroit Northeast and the Motel 6 Warren, Michigan – Detroit East.  (ECF No. 96, PageID.1210, 1216).  First, K.O. alleges that Defendant G6 can be held directly liable for the trafficking that occurred at the Motel 6 Warren between 2003 and 2011, while they oversaw the day-to-day operations of the hotel.  However, as discussed above, K.O.'s claims arising before August 15, 2012 are barred by the relevant statute of limitations.  As such, her direct liability claim against Defendant G6 regarding the Motel 6 Warren is time-barred, and their liability must be assessed through their franchisee, Defendant Warren Economy.  Defendant G6, however, directly operated the Madison Heights location during all years relevant to this case and, as such, her direct liability claim is timely.  *Id.*  Defendant G6 did not file an independent motion to dismiss, instead filing a notice of joinder in Defendant Marriott's motion to dismiss, ECF No. 108.  (ECF No. 110).  They argue the claims against the two companies are based on "virtually identical allegations" and K.O.'s

direct liability claims must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).  The court agrees.

K.O. alleges she was trafficked at the Motel 6 Madison Heights between 2003 and 2014 and, during that time, "there were open and obvious signs of sex trafficking, including but not limited to approximately fifteen (15) rooms being rented at the same time to traffickers of women forced into commercial sex work."  (ECF No. 96, PageID.1191).  To state a direct liability claim against Defendant G6, K.O. must allege facts sufficient to allow the court to infer that Defendant G6 (1) knowingly benefitted, (2) from participation in the venture, (3) which they knew or should have known engaged in sex trafficking in violation of § 1591.  *See H.G.*, 489 F. Supp. 3d at 704.

As discussed above, courts generally agree that receiving a percentage of the revenue from rooms rented by a victim's trafficker is sufficient to satisfy the first element of this test.  *See J.L.*, 521 F. Supp. 3d at 1061 (agreeing that "because Wyndham received a percentage of room revenue generated by La Quinta, including from the room that plaintiff's trafficker rented, it benefited from the trafficking.").  K.O. makes similar allegations against Defendant G6, arguing that her trafficker paid for the room rentals at each of the Defendants' hotels, including the Motel 6 Madison Heights.  (ECF No. 96, PageID.1239 ("[Defendants]

"knew, or should have known…they were knowingly benefitting financially from said exploitation, because Plaintiff's traffickers frequented the Defendants' hotels and paid for the room rentals"); PageID.1186 ("[r]eceipt of a percentage (or the entirety) of the room rentals from the rooms where Plaintiff was victimized and trafficked is sufficient for establishing a knowing financial benefit as well as licensing, franchising, and other fees paid from room rentals under § 1595(a)"). As such, the court agrees that K.O. has satisfied the first element to show Defendant G6 received a "knowing benefit."

The second factor requires K.O. to allege that Defendant G6 participated in a venture with her trafficker at the Motel 6 Madison Heights. *J.G.*, 619 F. Supp. at 1236. While this venture need not specifically be a "sex trafficking venture," and instead may be a "commercial venture," plaintiff must plausibly allege "at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement." *T.E.*, 2024 WL 474400, at *6 (citations omitted). K.O. argues there was "a continuous business relationship or venture occurring through the rental of rooms between Plaintiff's traffickers and Defendants." (ECF No. 96, PageID.1242). Specifically, she alleges she was trafficked at the Motel 6 Madison Heights "approximately

once a month" between 2003 and 2012 and, during this time, "G6 failed to train, implement, and enforce any of its own anti-trafficking policy or policies to protect Plaintiff form [sic] being sex trafficked" at this location. *Id.*, PageID.1211. These allegations, including that Defendant's staff regularly rented rooms to K.O.'s trafficker every month and failed to otherwise implement their own anti-trafficking policies, are sufficient at this stage to establish a continuous business relationship. *See G.G.*, 76 F.4th at 560 ("To survive a motion to dismiss, all that is necessary is for a plaintiff to allege such a 'continuous business relationship,' which gives rise to an inference, drawn in the plaintiff's favor, that the civil defendant facilitated the venture's success.").

To satisfy the third element, K.O. must plausibly allege that "the defendant had either actual or constructive knowledge that the venture violated the TVPRA." *Doe # 1*, 21 F.4th at 725 (emphasis added). The majority of K.O.'s allegations about the signs of sex trafficking apply to commercial sex or trafficking more broadly, including allegations that there were often "cash payments for rooms," "excessive condoms, lubricant, 'do not disturb' signs being constantly hung on doors," as well as "*women* arriving to hotels and being checked in with their trafficker with little to no personal possessions; *women* arriving with signs of physical abuse; [and] *women* arriving at the hotel who appear fearful or anxious."

(*See* ECF No. 96, PageID.1147) (emphasis added).  These allegations refer to "women" generally and do not specify that any of these things occurred directly at the Motel 6 Madison Heights.  *See H.G.*, 489 F. Supp. 3d at 705 ("these allegations that Defendants were generally aware of sex trafficking in the hotel industry and at some properties operating under their brand names fall short of establishing that Defendants knew or should have known of sex trafficking *by the ventures in which they purportedly participated.*") (emphasis in original).  K.O.'s only allegations that directly implicate the Motel 6 Madison Heights state that, at some point over a span of 11 years, "there were open and obvious signs of sex trafficking, including but not limited to approximately fifteen (15) rooms being rented at the same time to traffickers of women forced into commercial sex work."  (ECF No. 96, PageID.1191).  While these facts may have allowed staff at the Motel 6 Madison Heights to guess or assume that K.O. was included in these "15 rooms" being rented for commercial sex, she was one of these "women arriving with signs of physical abuse," or that she was the source of any of these "open and obvious signs" of sex trafficking, they are insufficient to indicate that staff "should have known" of this specific venture.  *See G.G.*, 76 F.4th at 557 ("to allow allegations that a civil defendant was aware of sporadic sex trafficking in low-budget hotels generally to show constructive knowledge of a particular sex

trafficking venture 'unjustifiably bridges the scienter gap between should have known and might have been able to guess.'") (internal quotation marks omitted).

These allegations can also be compared to other cases in which courts have found sufficient knowledge based on specific facts of a plaintiff's sex trafficking at a hotel. *See M.A.*, 425 F. Supp. 3d at 962 ("[d]espite her desperate pleas and screams for help, after being beaten or choked at the Defendants' hotel properties, the hotel staff ignored her and did nothing to prevent the ongoing and obvious torture she endured."); *A.R. v. Wyndham Hotels & Resorts, Inc.*, No. 2:21-CV-04935, 2022 WL 17741054, at *1 (S.D. Ohio Dec. 16, 2022) (plaintiff alleged "she called the front desk of the [hotel] for help when her trafficker and a 'john' got into a fight and a hotel employee arrived to break up the fight," "unusually large numbers of male guests asking for [plaintiff] at the front desk," and "one of [plaintiff's] traffickers regularly requesting that hotel staff notify him when A.R. attempted to leave the hotels."). K.O. has alleged nothing that rises to this level of specificity or would alert Defendant G6's staff to the particular venture in which she was involved. *See L.H.*, 2023 WL 5725574, at *7 ("When courts have permitted direct liability claims to proceed, they were presented with stronger facts 'connecting the dots' than those presented here."). Because she has failed

to plausibly allege the third factor of this test, her claims brought under a direct

liability theory against Defendant G6 must fail as a matter of law.

2.      *Defendant Red Roof*

K.O. argues Defendant Red Roof is also directly liable under the TVPRA

because "they directly observed and at times participated [in] and aided the sex

trafficking of Plaintiff."  (ECF No. 96, PageID.1212).  K.O. alleges she was trafficked

at four different hotels under the Red Roof Inn umbrella: the Red Roof Inn

Plymouth/Canton, the Red Roof Inn Detroit – Royal Oak Madison Heights; the Red

Roof Inn Ann Arbor – University of Michigan South, and the Red Roof PLUS+ Ann

Arbor – University of Michigan North.  *Id.*, PageID.1179-80.  K.O. alleges she was

trafficked at the Red Roof Inn Plymouth/Canton so often between the years 2003

and 2013 "she considered this her home."  *Id.*, PageID.1194.  She alleges the

"[h]otel employees would occasionally hide her in different hotel rooms in an

attempt to help her, but did not call law enforcement, take steps to stop the

trafficking, and [would] always welcome K.O.'s trafficker back and rent[] rooms to

him."  *Id.*  Additionally, she alleges that her "trafficker once threw a fire

extinguisher through a window out of anger."  *Id.*  K.O. alleges she was trafficked

at the Red Roof Inn Detroit – Royal Oak Madison Heights "between 2011 and

2014," but includes no other specific allegations of her time there.  *Id.*  K.O.

alleges she was trafficked at the Red Roof PLUS+ Ann Arbor University of Michigan North "between 2011 and 2014."  *Id.*  She alleges that "[w]hile this hotel was largely used to house patients undergoing radiation treatment, the hotel employees knew what to do with 'undesirable' guests: relegate them to the rooms in the back corners of the hotels."  *Id.*  K.O. argues she and her trafficker "were placed in the same hotel room every time he brought her to this location." *Id.*  Finally, K.O. alleges she was trafficked at the Red Roof Inn Ann Arbor – University of Michigan South between 2011 and 2014, but also does not include any specific allegations about her time there.

Defendant Red Roof's motion to dismiss, ECF No. 111, argues that K.O. "fails to articulate the existence of any 'venture' between RRI and Plaintiff's unidentified trafficker(s) beyond a general allegation that there 'was a continuous business relationship or venture occurring through the rental of rooms between Plaintiff's trafficker and Defendants.'"  (ECF No. 111, PageID.1613).  They also note that K.O. does not bring a claim against the franchisees of these properties, and argue that she does not indicate how Defendant Red Roof, who "offers public lodging services directly **and through its affiliates, subsidiaries, and franchisees**" at each of the Red Roof-branded properties could have been a direct participant in this venture with her trafficker.  (*See* ECF No. 96, PageID.1179) (emphasis

added); (*see also* ECF No. 96, PageID.1180) ("[Red Roof] retains control over the RRI Hotels **under the terms of its franchise agreements**") (emphasis added).  For the reasons stated below, the court agrees.

To state a direct liability claim, K.O. must allege facts sufficient to allow the court to infer that Defendant Red Roof (1) knowingly benefitted, (2) from participation in the venture, (3) which they knew or should have known engaged in sex trafficking in violation of § 1591.  *See H.G.*, 489 F. Supp. 3d at 704.  As discussed at length above, courts generally agree that receiving a percentage of the revenue from rooms rented by a victim's trafficker is sufficient to satisfy the first element of this test.  As such, K.O. has sufficiently alleged that Defendant Red Roof received a "knowing benefit."

The second factor requires K.O. to plausibly allege that Defendant Red Roof participated in a venture with her trafficker at all four of the Red Roof Inn-branded hotels.  *J.G.*, 619 F. Supp. 3d at 1236.  While this venture need not specifically be a "sex trafficking venture," and instead may be a "commercial venture," plaintiff must plausibly allege "at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement."  *T.E.*, 2024 WL 474400, at *6 (citations

omitted).  K.O. argues there was "a continuous business relationship or venture

occurring through the rental of rooms between Plaintiff's traffickers and

Defendants."  (ECF No. 96, PageID.1242).  K.O. does not include *any* specific facts,

let alone facts suggesting her trafficker established a continuous business

relationship with the staff at the Red Roof Inn Madison Heights or the Red Roof

Inn Ann Arbor – University of Michigan South.  *Id.*, PageID.1194.  She alleges the

staff at the Red Roof Inn PLUS+ Ann Arbor – University of Michigan North "knew

what to do with 'undesirable guests'" and she was "placed in the same hotel

room every time [her trafficker] brought her to this location."  *Id*.  Additionally,

she argues she was trafficked at the Plymouth/Canton Red Roof Inn "so

often…she considered this her home" and the staff would "always welcome [her]

trafficker back and rent[] rooms to him."  *Id.*  While these facts may suggest the

hotel *franchisees* had a continuous business relationship with K.O.'s trafficker,

they do not suggest how the corporate entity Defendant Red Roof could have

"established a pattern of conduct or could be said to have a tacit agreement" with

K.O.'s trafficker.  *See J.G.*, 619 F. Supp. 3d at 1236 (noting that "Plaintiff brings her

TVPRA beneficiary claim against the *operator* of the hotel in which she was

allegedly trafficked – an operator that was closely involved with the daily

management of the hotel and allegedly did far more than simply receive

revenue…"); *Doe # 1*, 21 F.4th at 729-30 (Jordan, J. concurring) (highlighting the

difference between claims against those who "own, operate, or manage the

hotels in question (e.g. franchisees)" and claims against "franchisors which do not

operate or manage the hotels at which sex trafficking allegedly occurred.").  Even

viewing these facts in the light most favorable to K.O., because she has failed to

establish Defendant Red Roof participated in a venture with her trafficker, her

direct liability claim against Defendant Red Roof must fail.

ii.     *Indirect Liability Claims – Parent Hotel Brands*

K.O. next argues Defendants G6, Marriott, Knights, and Holiday are

"vicariously liable for the conduct of the local operating hotels who are either

their franchise partners or agents due to their level of control."  (ECF No. 96,

PageID.1214).  Under § 1595, a plaintiff may bring an indirect claim against a

defendant, which imputes "to the defendant the acts, omissions, and state of

mind of an agent of the defendant."  *A.R.*, 2022 WL 17741054, at *7 (citing *J.L*,

521 F. Supp. 3d at 1060).  To state a claim for indirect liability under an agency

theory, a plaintiff must plausibly allege: "(1) defendant and the franchisee were in

an agency relationship, and (2) the franchisee's employees are plausibly liable

under § 1595."  *J.L.*, 521 F. Supp. 3d at 1064-65.

There is generally a split of authority among courts as to "whether state common law or federal common law applies to the question of whether a party can be held indirectly liable under the TVPRA based on an agency relationship." *H.G.*, 489 F. Supp. 3d at 708 (comparing *S.J.*, 473 F. Supp. 3d at 154-55 (applying "New York agency law" to resolve whether plaintiff could rely "upon an agency theory to indirectly impose liability on the franchisor defendants under the TVPRA") with *A.B. v. Hilton Worldwide*, 484 F. Supp. 3d at 939 ("examin[ing] vicarious liability as a question of federal common law.")).  The Sixth Circuit has yet to weigh in on this question, and District Courts within this circuit have varied in their approach.  *See H.G.*, 489 F. Supp. 3d at 708; *T.E.*, 2024 WL 474400, at *8.  Here, the court finds that the analysis is largely the same under federal common law and Michigan law and, as such, will follow the lead of *H.G. v. Inter-Cont'l Hotels Corp.* and apply Michigan common law.  *H.G.*, 489 F. Supp. 3d at 708 ("Here, both parties analyzed this issue under state law.  The Court will therefore treat the question as one that arises under Michigan law.").

Under Michigan law "the test for a principal-agent relationship is whether the principal has the right to control the agent."  *Id.* (citing *Little v. Howard Johnson Co.*, 183 Mich. App. 675 (1990)) (internal citation omitted).  When two parties are allegedly in a franchisor-franchisee relationship, the court must

determine whether the "franchisor [has] the right to control the day-to-day operations of a franchisee…it is not enough that the owner retained mere contractual control, the right to make safety inspections, or general oversight." *Id.* (citation omitted); *see also Viches v. MLT, Inc.*, 127 F. Supp. 2d 828, 832 (E.D. Mich. 2000) (applying Michigan law) (finding no agency relationship between hotel franchisor and franchisee where the franchise agreement did no more than give the franchisor control over the quality of services the hotel provided by mandating such things as table and place settings, laying out job duties and responsibilities, specifying how reservations would be taken, and allowing the franchisor to inspect the hotel periodically.).

### 1.   Defendant G6

In addition to her claims for direct liability, K.O. argues Defendant G6 is "indirectly and vicariously liable" for her trafficking at the Motel 6 Warren through its agent and franchisee, Defendant Warren Economy.  (ECF No. 96, PageID.1216).  She argues she was trafficked at the Motel 6 Warren "approximately once per month" between 2003 and 2012, and "the signs of sex trafficking were so open and obvious that hotel employees did not want Plaintiff and her trafficker in the hotel yet failed to call law enforcement or otherwise aid Plaintiff and other women who were trafficked" there.  *Id.*, PageID.1191.  K.O.

further argues Defendant Warren Economy was an agent of Defendant G6 because Defendant G6 exercised control over the day-to-day operations of the property, including the hotel's policy on human trafficking.  *Id.*, PageID.1216. Specifically, she alleges Defendant G6 "exercises actual control over its franchisees, including the Warren Economy d/b/a Motel 6 of Warren, through control over the brand standards, which are reflected through the franchise agreements entered into with each franchisee subsidiary or operating hotel."  *Id.* Defendant G6 allegedly "controls the training, procedures, and policies for its brand hotels," provides "on-site and other opening training and assistance," "receives a percentage of the gross room revenue from the money generated by the operations of the Motel 6 of Warren," "receives program fees through a percentage fee taken from gross room revenues," requires franchisees to attend their annual conference, offers additional general management training to franchisees, offers wireless internet access to franchisees, and requires franchisees to comply with the standards and policies in Defendant G6's operating manual.  *Id.*, PageID.1217-18.  Additionally, Defendant G6 allegedly sends its teams to "regularly assess properties to ensure safety and security measures are in place."  *Id.*

While these standards allow Defendant G6 to exert sizeable control over

the operation of the Motel 6 Warren, they are insufficient under Michigan law to

show that Defendant G6 exercised control over the *actual day-to-day work*

occurring at that location.  *See Little*, 183 Mich. App. at 681.  "'Facts tending to

show that the franchisors' involvement was limited to uniformity and

standardization of the brand' have been found to be insufficient to establish

'complete control over the day-to-day operations of the franchisee's business.'"

*H.G.*, 489 F. Supp. 3d at 708-09 (citing *S.J.*, 473 F. Supp.3d at 940; *Little,* 183 Mich.

App. at 681 (holding that a "franchise agreement [that] primarily insured the

uniformity and standardization of products and services offered by a Howard

Johnson restaurant" did not amount to "obligations" that "affect the control of

daily operations"); *Acedo v. DMAX, Ltd.*, No. CV1502443MMMASX, 2015 WL

12696176, at *29 (C.D. Cal. Nov. 13, 2015) (applying Michigan law, holding that

plaintiff had failed to allege principal-agent relationship, and explaining that "[i]n

the [] franchisor-franchisee context…Michigan courts have held that a franchisor's

retention of the right to set standards regarding products and services offered by

the franchisee, its right to regulate furnishings and advertising used by the

franchisee, and its right to inspect to determine compliance with the terms of the

franchise agreement is insufficient to establish the existence of an agency

relationship")).  While Defendant G6 may have exercised their authority to ensure

customers received a uniform brand experience, such as by standardizing the

training of managers and employees and requiring compliance with their

operating manual, Defendant Warren Economy is tasked with the day-to-day

operation of the hotel.  *See Courser v. Radisson Hotels Int'l, Inc.*, No. 1:18-CV-

1232, 2023 WL 43640566, at *7 (W.D. Mich. July 13, 2023) (finding no agency

relationship between hotel franchisor and franchisee where "it is clear that

[franchisee] was solely responsible for the daily operation of the Hotel.").  As

such, even assuming these allegations are true, they fail to sufficiently

demonstrate an actual agency relationship between Defendant G6 and Defendant

Warren Economy.

K.O. also alleges an apparent agency relationship existed because

"Defendant G6 holds Motel 6 hotels to the public as possessing authority to act

on its behalf."  (ECF No. 96, PageID.1219).  Under Michigan law, "apparent

authority may arise when acts and appearances lead a third person reasonably to

believe that an agency relationship exists."  *Aero Taxi-Rockford v. Gen. Motors

Corp.*, No. 259565, 2006 WL 1479915, at *3 (Mich. Ct. App. May 30, 2006).

However, Plaintiff has not alleged any facts tending to show she relied on any

representations made by either Defendant G6 or Defendant Warren Economy

when she was brought against her will to the Motel 6 of Warren, and her claim

based on an apparent agency theory also fails as a matter of law.  Because K.O.

has not sufficiently alleged an agency relationship existed between Defendant G6

and their franchisee, Warren Economy, it is not necessary to analyze whether the

franchisee's employees are plausibly liable under § 1595.  K.O.'s indirect liability

claim as to Defendant G6 must be dismissed as a matter of law.

2.   *Defendant Marriott*

K.O. argues Defendant Marriott is "indirectly and vicariously liable under

the TVPRA as a principal for the failures of its agent Farmington Hospitality."  (ECF

No. 96, PageID.1222).  K.O. alleges she was trafficked at the Fairfield Inn & Suites

Farmington Hills between 2003 and 2014, and her "trafficker brought her to this

hotel with such frequency that hotel staff would hold or reserve the room for her

trafficker."  *Id.*, PageID.1191.  She further describes one incident "where her

trafficker beat her…breaking several of her bones," and "[she] begged hotel staff

to give her a phone to call her brother."  *Id.*  K.O. also claims she attempted

suicide at this hotel in 2014 by purposefully walking in front of a moving vehicle.

*Id.*  Defendant Marriott's motion to dismiss argues that K.O. fails to allege they

had a sufficient agency relationship with Defendant Farmington Hospitality.  (ECF

No. 108, PageID.1421).  The court agrees.

44

K.O. alleges Defendant Marriott was "responsible for ensuring its franchisees comply with all provisions of its sex trafficking training" and had previously "issued and published policies to address the problem [of human trafficking]." (ECF No. 96, PageID.1157, 1222). She also alleges Defendant Marriott exercised control over the day-to-day operations of the Fairfield Inn & Suites Farmington Hills in a number of specific ways, including:

> i. Sales Mangers and Reservation Managers are required to devote their full time to the management and operation of the Hotel, and cannot be employed in any other capacity by the Franchisee or its Affiliates without Marriott's express written consent;
> ii. Franchisees are required to keep restaurants and lounges open and in normal operation for such minimum hours and days stipulated by Marriott;
> iii. Franchisees are required to maintain in sufficient supply, and use at all times, certain food and beverage products and ingredients, supplies, paper goods, dinnerware and furnishings;
> iv. Franchisees are prohibited from installing vending machines or video games on the premises.

*Id.*, PageID.1224-25.

Under Michigan law, these allegations are not sufficient to show that Defendant Marriott exercised control and direction over the actual day-to-day work occurring at the Fairfield Inn & Suites Farmington Hills. *See Little*, 183 Mich. App. at 681. The ability to control the operating hours of the restaurant and

45

lounge, the food and beverage products, paper goods, and furnishings, as well as the presence of vending machines or video games allows Defendant Marriott to have control over the "quality of services its franchisee provides" through "uniformity and standardization of…services."  *See Viches*, 127 F. Supp. 2d at 832. Further, the ability to enact certain restrictions on the duties of franchise managers does not suggest that Defendant Marriott has actual control over their day-to-day roles or tasks.  Finally, while Defendant Marriott may have retained the ability to control the hotel's broader response to human trafficking, including by publishing company-wide policies to address the problem or providing training to employees, these again serve to ensure the "uniformity and standardization of…services" across the company.  *Id.*  As such, even assuming these allegations are true, they fail to sufficiently demonstrate that Defendant Marriott exercised control over the day-to-day operations of the Fairfield Inn & Suites Detroit Farmington Hills.

K.O. also alleges an apparent agency relationship existed because "Defendant Marriott holds Marriott hotels – and its franchisee Farmington Hospitality – to the public as possessing authority to act on its behalf."  (ECF No. 96, PageID.1225).  Under Michigan law, "apparent authority may arise when acts and appearances lead a third person reasonably to believe that an agency

relationship exists." *Aero Taxi-Rockford*, 2006 WL 1479915, at *3.  However, K.O. again has not alleged any facts tending to show she relied on any representations made by either Defendant Farmington Hospitality or Defendant Marriott when she was brought against her will to the Fairfield Inn & Suites Farmington Hills.  As such, her claim based on an apparent agency theory also fails as a matter of law. Because K.O. has not sufficiently alleged any agency relationship existed between Defendant Marriott and their franchisee Defendant Farmington Hospitality, they cannot be liable as their agent.  It is not necessary to analyze whether the franchisee's employees are plausibly liable under § 1595, and K.O.'s claim as to Defendant Marriott must be dismissed as a matter of law.

### 3.    *Defendant Knights*

K.O. alleges Defendant Knights is "indirectly and vicariously liable under the TVPRA as a principal for the failures of its agent Akram Namou."  (ECF No. 96, PageID.1228).  K.O. alleges she was trafficked at the Knights Inn Sterling Heights from 2003 to 2014.  *Id.*, PageID.1192.  She "recalls the name of the manager who would look at her with disgust," and alleges that the same man once "told Plaintiff's trafficker to be more quiet [sic] while Plaintiff was being trafficked, stating 'this is not your home.' And yet he did nothing to help."  *Id.*  Defendant Knights' motion to dismiss argues K.O. has failed to establish Defendant Knights

had an agency relationship with Defendant Namou.  (ECF No. 106, PageID.1341).

The court agrees.

K.O. alleges Defendant Knights exercised control over Defendant Namou

and the Knights Inn Sterling Heights "with respect to many issues regarding the

day-to-day operation of the property, but also specifically with regard to the local

hotel's policy on human trafficking."  (ECF No. 96, PageID.1228).  She also alleges

Defendant Knights "exercises actual control over its franchisees, including Akram

Namou…through control over the brand standards which are reflected through

the franchise agreements entered into with each franchisee subsidiary or

operating hotel."  *Id.*, PageID.1229.  K.O. lists seven ways in which Defendant

Knights *could have* exercised control over the local hotel, but each of these are

related to a broader sex trafficking policy, and do not indicate Defendant Knights

had the ability to control any of the day-to-day operations of the Knights Inn

Sterling Heights.  *See id.* ("Defendant Knights Franchise *may exercise or could

have exercised* control over the local hotel by: i. distributing information to assist

employees in identifying human trafficking; ii. providing a process for escalating

human trafficking concerns within the organization…") (emphasis added).  For the

reasons explained in more detail above, these allegations are insufficient under

Michigan law to show that Defendant Knights exercised control and direction over

48

the actual day-to-day operation of the Knights Inn Sterling Heights.  *See Little*, 183 Mich. App. at 681.

K.O. also argues an apparent agency relationship existed because "Defendant Knights Franchise holds Knights Franchise hotels – and franchisee Akram Namou d/b/a Knights Inn Sterling Heights – to the public as possessing authority to act on its behalf."  (ECF No. 96, PageID.1230).  However, K.O. again has not alleged any facts suggesting she relied on any representations made by either Defendant Knights or Defendant Namou when she was brought against her will to the Knights Inn Sterling Heights.  As such, her claim based on an apparent agency theory also fails as a matter of law.  Because K.O. has not sufficiently alleged an agency relationship existed between Defendant Knights and their franchisee Defendant Namou, they cannot be liable as their agent.  It is not necessary to analyze whether the franchisee's employees are plausibly liable under § 1595, and K.O.'s claim as to Defendant Knights must be dismissed as a matter of law.

### 4.    *Defendant Holiday*

K.O. alleges Defendant Holiday is "indirectly and vicariously liable under the TVPRA as a principal for the failures of its agent(s) at the Holiday Inn Express & Suites Southfield Detroit."  (ECF No. 96, PageID.1233).  K.O. alleges she was

trafficked at the Holiday Inn Express & Suites Southfield "commencing in approximately 2005 through 2014" and alleges there were open and obvious signs of sex trafficking at this hotel, "including young and underage girls whose pimps rented them rooms." *Id.*, PageID.1192-93. She further alleges that she, "recognizing how young some of these girls were, would often take their 'jobs' to protect them." *Id.* K.O. alleges Defendant Namou was the franchisee for the Holiday Inn & Suites Southfield Detroit from 2006 until 2007 but, as detailed above, any claims from this time period are outside the statute of limitations. As such, the court will analyze K.O.'s claims only as to Defendant Holiday and their franchisee Defendant Southfield, who operated the Holiday Inn Express & Suites Southfield from 2007-2014. *Id.*, PageID.1165. Defendant Holiday's motion to dismiss argues K.O. "fails to allege *facts* sufficient to plausibly set forth a claim that [Defendant Holiday] exercised the requisite day-to-day control over its franchised hotel. Rather, the allegations in the TAC regarding the relationship between [Defendant Holiday] and its franchisee, merely describe a standard franchisor/franchisee relationship, which is insufficient to create agency liability." (ECF No. 113, PageID.1673) (emphasis in original). The court agrees.

K.O. alleges Defendant Holiday exercised control over Defendant Southfield and the Holiday Inn Express & Suites Southfield "with respect to many issues

regarding the day-to-day operation of the property, but also specifically with regard to the local hotel's policy on human trafficking."  (ECF No. 96, PageID.1233).  She also alleges Defendant Holiday "exercises actual control over its franchisees through control over the brand and license standards which are reflected through the franchise agreements entered into with each franchisee." *Id.*, PageID.1235.  K.O. lists seven ways in which Defendant Holiday *could have* exercised control over the local hotel, but each of these are related to a broader sex trafficking policy, and do not indicate Defendant Holiday had the ability to control any of the day-to-day operations of the Holiday Inn Express & Suites Southfield.  *See id.* ("Defendant Holiday [] *may exercise or could have exercised* control over the local hotel by: i. distributing information to assist employees in identifying human trafficking; ii. providing a process for escalating human trafficking concerns within the organization…") (emphasis added).  For the reasons explained in more detail above, these allegations are insufficient under Michigan law to show that Defendant Holiday exercised control and direction over the actual day-to-day operation of the Holiday Inn Express & Suites Southfield.  *See Little*, 183 Mich. App. at 681.

K.O. also alleges an apparent agency relationship existed because "Defendant Holiday held out the local brand hotels to the public as possessing

authority to act on its behalf." (ECF No. 96, PageID.1235). However, K.O. again has not alleged any facts suggesting she relied on any representations made by either Defendant Holiday or Defendant Southfield when she was brought against her will to the Holiday Inn Express & Suites Southfield. As such, her claim based on an apparent agency theory also fails as a matter of law. Because K.O. has not sufficiently alleged an agency relationship existed between Defendant Holiday and their franchisee Defendant Southfield, they cannot be liable as their agent. It is not necessary to analyze whether the franchisee's employees are plausibly liable under § 1595, and K.O.'s claim as to Defendant Holiday must be dismissed as a matter of law.

   iii.   *Direct Claims – Hotel Franchisees*

   Finally, K.O. brings a group of direct liability claims against four hotel franchisees, Defendant Farmington Hospitality, Defendant Namou, Defendant Southfield, and Defendant ESA Management.[4] (ECF No. 96, PageID.1212). Plaintiff argues each of these franchisees are "[d]irectly [l]iable under the TVPRA because they directly observed and at times participated and aided the sex trafficking of Plaintiff." *Id.* As stated above, in order to bring a direct liability

---

  [4] K.O. also brings a claim under this section against Defendant Red Roof. (ECF No. 96, PageID.1212). However, as discussed above, this claim is better analyzed in relation to Defendant Red Roof's status as a "parent company," rather than a franchisee.

claim, a plaintiff must satisfy each of the relevant elements by showing that the "defendant's *own* acts, omissions, and state of mind establish each element." *B.D.G.*, 2023 WL 5935646, at *3 (citing *J.L.*, 521 F. Supp. 3d at 1060) (emphasis added).  Specifically, a plaintiff "must 'connect the dots' between her and a franchisor to satisfy the 'participation in a venture' element and she must allege more than 'general knowledge of sex trafficking problems in the hotel industry or even at defendants' franchisee hotels.'" *L.H.*, 2023 WL 5725574, at *6 (citing *J.M.*, 2022 WL 10626493, at *5).

### 1.    *Defendant Farmington Hospitality*

K.O. brings a direct liability claim against Defendant Farmington Hospitality for her sex trafficking that allegedly occurred at the Fairfield Inn & Suites Farmington Hills.  (ECF No. 96, PageID.1142).  K.O. alleges she was trafficked at this location between 2003 and 2014, and her "trafficker brought her to this hotel with such frequency that hotel staff would hold or reserve the room for her trafficker."  *Id.*, PageID.1191.  She further describes an incident "where her trafficker beat her…breaking several of her bones," and "[she] begged hotel staff to give her a phone to call her brother."  *Id.*  K.O. also claims she attempted suicide at this hotel in 2014 by purposefully walking in front of a moving vehicle. *Id.*  Defendant Farmington Hospitality did not file an independent motion to

dismiss, instead filing a notice of joinder in Defendant Holiday Hospitality's

motion to dismiss, ECF No. 113, along with Defendant Southfield.  (ECF No. 130).

For the reasons stated below, the court finds that K.O. has sufficiently stated a

direct liability claim against Defendant Farmington Hospitality under the TVPRA.

To state a direct liability claim, K.O. must allege facts sufficient to allow the

court to infer that Defendant Farmington Hospitality (1) knowingly benefitted, (2)

from participation in the venture, (3) which they knew or should have known

engaged in sex trafficking in violation of § 1591.  *See H.G.*, 489 F. Supp. 3d at 704.

As discussed at length above, courts generally agree that receiving a percentage

of the revenue from rooms rented by a victim's trafficker is sufficient to satisfy

the first element of this test.  As such, K.O. has sufficiently alleged that Defendant

Farmington Hospitality received a "knowing benefit."

The second factor requires K.O. to plausibly allege that Defendant

Farmington Hospitality participated in a venture with her trafficker at the Fairfield

Inn & Suites Farmington Hills.  *J.G.*, 619 F. Supp. at 1236.  While this venture need

not specifically be a "sex trafficking venture," and instead may be a "commercial

venture," K.O. must plausibly allege "at least a showing of a continuous business

relationship between the trafficker and the hotels such that it would appear that

the trafficker and the hotels have established a pattern of conduct or could be

said to have a tacit agreement." *T.E.*, 2024 WL 474400, at *6 (citations omitted).

K.O.'s general allegations about the "open and obvious" signs of sex trafficking at

the hotel, claims that she was brought to this location "with such frequency," and

allegations that the hotel staff often held or reserved a room for her arrival are

sufficient, at least at this stage in the proceedings, to suggest a pattern of conduct

or a "tacit agreement." *See G.G.*, 76 F.4th at 560 ("To survive a motion to dismiss,

all that is necessary is for a plaintiff to allege such a 'continuous business

relationship,' which gives rise to an inference, drawn in the plaintiff's favor, that

the civil defendant facilitated the venture's success.").

To satisfy the third element, K.O. must plausibly allege "the defendant had

either actual or constructive knowledge that the venture violated the TVPRA."

*Doe # 1*, 21 F.4th at 725. The majority of K.O.'s allegations about the "open and

obvious" signs of sex trafficking apply to commercial sex or trafficking more

broadly, including allegations that there were often "cash payments for rooms,"

"excessive condoms, lubricant, 'do not disturb' signs being constantly hung on

doors," as well as "*women* arriving to hotels and being checked in with their

trafficker with little to no personal possessions; *women* arriving with signs of

physical abuse; [and] *women* arriving at the hotel who appear fearful or anxious."

(*See* ECF No. 96, PageID.1147) (emphasis added). These allegations refer to

"women" generally and do not specify that any of these things occurred directly at the Fairfield Inn & Suites Farmington Hills.  *See H.G.*, 489 F. Supp. 3d at 705 ("these allegations that Defendants were generally aware of sex trafficking in the hotel industry and at some properties operating under their brand names fall short of establishing that Defendants knew or should have known of sex trafficking *by the ventures in which they purportedly participated.*") (emphasis in original).  However, K.O. also alleges facts suggesting at least one incident in which the hotel staff should have been aware of the ongoing violence and sex trafficking that formed the basis of this specific venture.  Specifically, K.O. alleges that "[her] trafficker beat her so badly that he broke her bones and subsequently took her shoes, coat, and phone before leaving her at the hotel," and "[w]ithout shoes or a phone, and while suffering broken bones, Plaintiff begged hotel staff to give her a phone to call her brother."  (ECF No. 96, PageID.1191-92).

Courts in this circuit have previously found allegations that a defendant hotel "was on notice about the prevalence of sex trafficking generally at their hotels and failed to take adequate steps to train staff in order to prevent its occurrence," were sufficient to meet the knowledge requirement, so long as the plaintiff alleged facts "specific to her own sex trafficking, including a number of signs she alleges should have alerted staff to her situation."  *See M.A.*, 425 F.

Supp. 3d at 962; *A.R.*, 2022 WL 17741054, at *1.  Here, K.O. alleges she was

regularly trafficked at the Fairfield Inn & Suites Farmington Hills, and on at least

one occasion, "while suffering broken bones" she had to beg hotel staff to use

their phone.  (ECF No. 96, PageID.1192).  K.O. further alleges that, in light of this

incident, Defendant Farmington Hospitality "repeatedly failed to stop or

adequately address sex trafficking at their hotel[]." *Id.*, PageID.1214.  Viewing

these facts in the light most favorable to K.O., they are sufficient to allege

Defendant Farmington Hospitality's knowledge that the specific venture violated

the TVPRA.  As such, K.O. has sufficiently stated a direct liability claim against

Defendant Farmington Hospitality.

### 2.    *Defendant Namou*

K.O. brings a direct liability claim against Defendant Namou for the sex

trafficking that allegedly occurred at the Knights Inn Sterling Heights.[5]  (ECF No.

96, PageID.1212).  K.O. alleges she was trafficked at the Knights Inn Sterling

Heights from 2003 until 2014.  *Id.*, PageID.1192.  She claims to "recall[] the name

of the manager who would look at her with disgust," and alleges the same man

---

[5] K.O. also brings claims against Defendant Namou as the franchisee of the Holiday Inn
Express & Suites Southfield from 2003-2006.  (ECF No. 96, PageID.1192).  However, as discussed
above, these claims are outside of the statute of limitations and, therefore, only K.O.'s claims
relating to the Knights Inn Sterling Heights will be addressed here.

once "told Plaintiff's trafficker to be more quiet [sic] while Plaintiff was being trafficked, stating 'this is not your home.' And yet he did nothing to help." *Id.* Defendant Namou did not file a motion to dismiss, and did not join in any other party's motion.  However, because the issues regarding K.O.'s claims against Defendant Namou are substantially the same as the issues regarding her claims against the other Defendants, the court will address them at this time. Additionally, a question was raised at the hearing as to whether Defendant Namou, as an individual corporate owner, can remain as a party in this case. However, for the reasons stated below, K.O. has failed to state a claim for direct liability against Defendant Namou and he must be dismissed regardless.

To state a direct liability claim against Defendant Namou, K.O. must allege facts sufficient to allow the court to infer that Defendant Namou (1) knowingly benefitted, (2) from participation in the venture, (3) which they knew or should have known engaged in sex trafficking in violation of § 1591.  *See H.G.*, 489 F. Supp. 3d at 704.  As discussed at length above, courts generally agree that receiving a percentage of the revenue from rooms rented by a victim's trafficker is sufficient to satisfy the first element of this test.  As such, K.O. has sufficiently alleged that Defendant Namou received a "knowing benefit."

The second factor requires K.O. to plausibly allege that Defendant Namou participated in a venture with her trafficker at the Knights Inn Sterling Heights. *J.G.*, 619 F. Supp. 3d at 1236.  While this venture need not specifically be a "sex trafficking venture," and instead may be a "commercial venture," she must plausibly allege "at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement."  *T.E.*, 2024 WL 474400, at *6 (citations omitted).  K.O. argues there was "a continuous business relationship or venture occurring through the rental of rooms between Plaintiff's traffickers and Defendants."  (ECF No. 96, PageID.1242).  However, the only specific allegations K.O. includes about her time at the Knights Inn Sterling Heights involve her speculation as to one manager's "look of disgust."  *Id.*, PageID.1192.  She alleges she was trafficked at this hotel "from 2003 to 2014" but does not clarify how often she was trafficked there, whether she was trafficked there on more than one occasion, or whether the hotel employees continually engaged in business with her trafficker.  The only other facts she includes are alleged broadly as to all of the Defendant hotels during the entire 11-year span of her trafficking.  *Id.*, PageID.1147; *see also* PageID.1188-89 (listing "red flags" that "alerted or should have alerted

Defendants to Plaintiff's trafficking at their branded hotels.").  In order to satisfy

this factor, K.O. must plausibly allege that "the trafficker and the hotels have

established a pattern of conduct or could be said to have a tacit agreement."  *See*

*M.A.*, 425 F. Supp. 3d at 970.  Without making any specific connection between

the hotel staff and her trafficker, her allegations do not show a sufficient "tacit

agreement" to satisfy this factor.  *See A.B. v. H.K. Grp. of Co.*, 2022 WL 467786 at

*4 ("At most, Plaintiff's complaint contains conclusory allegations that claim

Defendants observed and/or had actual or constructive knowledge of the illegality

of sex trafficking allegedly occurring in its hotels.  By failing to allege a common

undertaking – between Defendants and the alleged traffickers – involving risk or

profit, Plaintiff's allegations do not support a TVPRA civil claim.").

    Even if K.O. had plausibly demonstrated that Defendant Namou's

employees participated in a venture with her trafficker, her direct liability claim

nevertheless fails because she has not alleged any facts tending to show that

Defendant Namou or Knights Inn Sterling Heights employees knew or should have

known this venture violated § 1591.  The majority of K.O.'s allegations about the

signs of sex trafficking at the Knights Inn Sterling Heights apply to commercial sex

or trafficking more broadly, including claims that there were often "cash

payments for rooms," "excessive condoms, lubricant, 'do not disturb' signs being

constantly hung on doors," as well as "*women* arriving to hotels and being

checked in with their trafficker with little to no personal possessions; *women*

arriving with signs of physical abuse; [and] *women* arriving at the hotel who

appear fearful or anxious."  (*See* ECF No. 96, PageID.1147).  These allegations

refer to "women" generally and do not specify that any of these things occurred

directly with K.O. at the Knights Inn Sterling Heights.  *See H.G.*, 489 F. Supp. 3d at

705 ("these allegations that Defendants were generally aware of sex trafficking in

the hotel industry and at some properties operating under their brand names fall

short of establishing that Defendants knew or should have known of sex

trafficking *by the ventures in which they purportedly participated.*") (emphasis in

original).  K.O.'s only allegations directly implicating the Knights Inn Sterling

Heights are that, at some point over a span of 11 years, she "recalls the name of

the manager who would look at her with disgust," and this same man "told

Plaintiff's trafficker to be more quiet [sic] while Plaintiff was being trafficked,

stating 'this is not your home[]' and yet he did nothing to help."  (ECF No. 96,

PageID.1192).  While this manager may have assumed or speculated that K.O. was

one of the "women arriving with signs of physical abuse" or was the source of any

of the "open and obvious signs" of sex trafficking, there are no facts supporting

that he, or any other staff member, "should have known" of this specific venture.

*See G.G.*, 76 F.4th at 557 ("to allow allegations that a civil defendant was aware of sporadic sex trafficking in low-budget hotels generally to show constructive knowledge of a particular sex trafficking venture 'unjustifiably bridges the scienter gap between should have known and might have been able to guess.'") (internal quotation marks omitted).

These allegations can also be compared to other cases in which courts have found sufficient knowledge based on specific facts of a plaintiff's sex trafficking at a particular hotel. *See M.A.*, 425 F. Supp. 3d at 962 ("[d]espite her desperate pleas and screams for help, after being beaten or choked at the Defendants' hotel properties, the hotel staff ignored her and did nothing to prevent the ongoing and obvious torture she endured."); *A.R.*, 2022 WL 17741054, at *1 (plaintiff alleged "she called the front desk of the [hotel] for help when her trafficker and a 'john' got into a fight and a hotel employee arrived to break up the fight," "unusually large numbers of male guests asking for [plaintiff] at the front desk," and "one of [plaintiff's] traffickers regularly requesting that hotel staff notify him when A.R. attempted to leave the hotels."). K.O. has alleged nothing that rises to this level of specificity or should have alerted Defendant Namou's staff to the particular venture in which she was involved. *See L.H.*, 2023 WL 5725574, at *7 ("When courts have permitted direct liability claims to proceed, they were presented with

stronger facts 'connecting the dots' than those presented here.").  Because she

has failed to plausibly allege both the second and third factors of this test, her

claim brought under a direct liability theory against Defendant Namou must fail as

a matter of law.

3.    *Defendant Southfield*

K.O. brings a direct liability claim against Defendant Southfield for her sex

trafficking that allegedly occurred at the Holiday Inn Express & Suites Southfield.

(ECF No. 96, PageID.1212).  K.O. alleges she was trafficked at this location

"commencing in approximately 2005 through 2014" and there were open and

obvious signs of sex trafficking at this hotel, "including young and underage girls

whose pimps rented them rooms."  *Id.*, PageID.1192-93.  She further alleges that

she, "recognizing how young some of these girls were, would often take their

'jobs' to protect them."  *Id.*  Defendant Southfield did not file an independent

motion to dismiss, but filed a notice of joinder in Defendant Holiday's motion

along with Defendant Farmington Hospitality.  (ECF No. 130).  For the reasons

stated below, K.O. has failed to state a claim for direct liability against Defendant

Southfield.

To state a direct liability claim against Defendant Southfield, K.O. must

allege facts sufficient to allow the court to infer that Defendant Southfield (1)

63

knowingly benefitted, (2) from participation in the venture, (3) which they knew or should have known engaged in sex trafficking in violation of § 1591.  *See H.G.*, 489 F. Supp. 3d at 704.  As discussed at length above, courts generally agree that receiving a percentage of the revenue from rooms rented by a victim's trafficker is sufficient to satisfy the first element of this test.  As such, K.O. has sufficiently alleged that Defendant Southfield received a "knowing benefit."

The second factor requires K.O. to plausibly allege Defendant Southfield participated in a venture with her trafficker at the Holiday Inn Express & Suites Southfield.  *J.G.*, 619 F. Supp. at 1236.  While this venture need not specifically be a "sex trafficking venture," and instead may be a "commercial venture," plaintiff must plausibly allege "at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement."  *T.E.*, 2024 WL 474400, at *6 (citations omitted).  K.O. argues there was a "continuous business relationship" between her trafficker and the staff because they "consistently and repeatedly rent[ed] rooms to Plaintiff's trafficker" and failed to "train, implement, and enforce any of its own anti-trafficking policy or policies to protect Plaintiff form [sic] being sex trafficked." (ECF No. 96, PageID.1213).  However, the only specific allegations K.O. includes

about her time at the Holiday Inn Express & Suites Southfield involve her own

observations that there were "young and underage girls whose traffickers and

pimps rented them rooms" and claims that she "would often take their 'jobs'" to

protect them.  *Id.*, PageID.1193.  She alleges she was trafficked at this hotel

"beginning in 2003" but does not clarify how often she was trafficked there,

whether she was trafficked there on more than one occasion, whether she was

trafficked there at any point within the relevant statute of limitations, or whether

the hotel employees continually engaged in business with her trafficker.  The only

other facts she includes are alleged broadly as to all of the Defendant hotels

during the entire 11-year span of her trafficking.  (*See* ECF No. 96, PageID.1147;

*see also* PageID.1188-89 (listing "red flags" that "alerted or should have alerted

Defendants to Plaintiff's trafficking at their branded hotels.")).  In order to satisfy

this factor, K.O. must plausibly allege that "the trafficker and the hotels have

established a pattern of conduct or could be said to have a tacit agreement."  *See*

*M.A.*, 425 F. Supp. 3d at 970.  Without making any specific connection between

the hotel staff and her trafficker, her allegations do not show a sufficient "tacit

agreement" to satisfy this factor.  *See A.B. v. H.K. Grp. of Co.*, 2022 WL 467786 at

*4 ("At most, Plaintiff's complaint contains conclusory allegations that claim

Defendants observed and/or had actual or constructive knowledge of the illegality

of sex trafficking allegedly occurring in its hotels. By failing to allege a common

undertaking – between Defendants and the alleged traffickers – involving risk or

profit, Plaintiff's allegations do not support a TVPRA civil claim.").

Even if K.O. had plausibly demonstrated that Defendant Southfield

participated in a venture with her trafficker, her direct liability claim nevertheless

fails because she has not alleged any facts tending to show Defendant Southfield

or Holiday Inn Express & Suites Southfield employees knew or should have known

this venture violated § 1591.  The majority of K.O.'s allegations about the signs of

sex trafficking at the Holiday Inn Express & Suites Southfield apply to commercial

sex or trafficking more broadly, including claims that there were often "cash

payments for rooms," "excessive condoms, lubricant, 'do not disturb' signs being

constantly hung on doors," as well as "*women* arriving to hotels and being

checked in with their trafficker with little to no personal possessions; *women*

arriving with signs of physical abuse; [and] *women* arriving at the hotel who

appear fearful or anxious."  (*See* ECF No. 96, PageID.1147).  These allegations

refer to "women" generally and do not specify that any of these things occurred

directly with K.O. at the Holiday Inn Express & Suites Southfield.  *See H.G.*, 489 F.

Supp. 3d at 705 ("these allegations that Defendants were generally aware of sex

trafficking in the hotel industry and at some properties operating under their

brand names fall short of establishing that Defendants knew or should have

known of sex trafficking *by the ventures in which they purportedly participated.*")

(emphasis in original).

K.O.'s only allegations directly implicating the Holiday Inn Express & Suites

Southfield are that, at some point over a span of 11 years, that there were "young

and underage girls whose traffickers or pimps rented them rooms," and

"recognizing how young some of these girls were, [she] would often take their

'jobs' to protect them."  (ECF No. 96, PageID.1193).  While these facts may have

allowed staff at the Holiday Inn Express & Suites Southfield to guess or assume

that K.O. was associated with these "underage girls," or was herself being

trafficked, they are insufficient to indicate that staff "should have known" of this

specific venture.  *See G.G.*, 76 F.4th at 557 ("to allow allegations that a civil

defendant was aware of sporadic sex trafficking in low-budget hotels generally to

show constructive knowledge of a particular sex trafficking venture 'unjustifiably

bridges the scienter gap between should have known and might have been able

to guess.'") (internal quotation marks omitted).  These allegations can also be

compared to other cases in which courts have found sufficient knowledge based

on specific facts of a plaintiff's sex trafficking at a particular hotel.  *See M.A.*, 425

F. Supp. 3d at 962 ("[d]espite her desperate pleas and screams for help, after

being beaten or choked at the Defendants' hotel properties, the hotel staff

ignored her and did nothing to prevent the ongoing and obvious torture she

endured."); *A.R.*, 2022 WL 17741054, at *1 (plaintiff alleged "she called the front

desk of the [hotel] for help when her trafficker and a 'john' got into a fight and a

hotel employee arrived to break up the fight," "unusually large numbers of male

guests asking for [plaintiff] at the front desk," and "one of [plaintiff's] traffickers

regularly requesting that hotel staff notify him when A.R. attempted to leave the

hotels.").  K.O. has alleged nothing that rises to this level of specificity or should

have alerted Defendant Southfield's staff to the particular venture in which she

was involved.  *See L.H.*, 2023 WL 5725574, at *7 ("When courts have permitted

direct liability claims to proceed, they were presented with stronger facts

'connecting the dots' than those presented here.").  Because she has failed to

plausibly allege both the second and third factors of this test, her claim brought

under a direct liability theory against Defendant Southfield must fail as a matter

of law.

### 4.   Defendant ESA Management

K.O. brings a direct liability claim against Defendant ESA Management for

her sex trafficking that allegedly occurred at three ESA-branded locations: the

Extended Stay America Detroit Canton, the Extended Stay America Detroit

Southfield, and the Extended Stay America Detroit Southfield I-696.  (ECF No. 96, PageID.1193).  K.O. alleges she was trafficked at these locations between 2005 and 2014, and notes that her trafficker "would take her to these hotels less frequently than others."  *Id.*  She also alleges a man from another country would "visit with regularity and call the hotel asking for [her]" and "recalls Hurricane Katrina refugees being housed at the Canton location."  *Id.*  Additionally, "employees working the front desk would recognize her and she knew their names" and she "had to go to a front desk clerk for help on more than one occasion due to her traffickers abuse [including] at least one instance where Plaintiff's trafficker had another individual with a gun stand watch over her when Plaintiff's trafficker need [sic] to leave."  *Id.*  Defendant ESA Management's motion to dismiss argues that K.O. "does not… [allege] when Plaintiff visited the three particular locations, with whom she and her alleged trafficker interacted, what those interactions consisted of, or any prior instances of forced labor that occurred at the Detroit locations such that would indicate any culpable knowledge of the sex trafficking venture in which ESA allegedly participated" and, therefore, their claims should be dismissed.  (ECF No. 112, PageID.1638).  For the reasons stated below, the court agrees.

To state a direct liability claim against Defendant ESA Management, K.O. must allege facts sufficient to allow the court to infer that Defendant ESA Management (1) knowingly benefitted, (2) from participation in the venture, (3) which they knew or should have known engaged in sex trafficking in violation of § 1591. *See H.G.*, 489 F. Supp. 3d at 704. As discussed at length above, courts generally agree that receiving a percentage of the revenue from rooms rented by a victim's trafficker is sufficient to satisfy the first element of this test. As such, K.O. has sufficiently alleged that Defendant ESA received a "knowing benefit."

The second factor requires K.O. to allege that Defendant ESA Management participated in a venture with her trafficker at each of their branded hotels. *J.G.*, 619 F. Supp. 3d at 1236. While this venture need not specifically be a "sex trafficking venture," and instead may be a "commercial venture," plaintiff must plausibly allege "at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement." *T.E.*, 2024 WL 474400, at *6 (citations omitted). Here, K.O. attempts to show that the hotel staff established a "continuous business relationship" by "consistently and repeatedly rent[ing] rooms to Plaintiff's trafficker" and by failing to "train, implement, and enforce any of its own anti-trafficking policy or policies

to protect Plaintiff form [sic] being sex trafficked."  (ECF No. 96, PageID.1212).

However, even viewing the allegations in the light most favorable to K.O., she has

not plausibly alleged "the trafficker and the hotels have established a pattern of

conduct or could be said to have a tacit agreement."  *See M.A.*, 425 F. Supp. 3d at

970.  Her allegations indicate that the hotel received calls on several occasions

asking for K.O., and the employees at the front desk would recognize her, but she

does not indicate how often she visited these hotels, noting only that it was "less

frequently than the others," or whether hotel staff continually reserved rooms for

her.  Without making any connection between the hotel's knowledge of sex

trafficking and continuous room rentals to K.O. and other victims, her allegations

do not rise to the level of showing any form of "tacit agreement" between hotel

staff and her trafficker.

Even if K.O. had plausibly demonstrated that Defendant ESA Management's

employees participated in a venture with her trafficker, her direct liability claim

nevertheless fails because she has not alleged any facts tending to show that

Defendant ESA Management or any of their branded hotel employees knew or

should have known this venture violated § 1591.  The majority of K.O.'s

allegations about the signs of sex trafficking at the ESA-branded hotels apply to

commercial sex or trafficking more broadly, including claims that there were often

"cash payments for rooms," "excessive condoms, lubricant, 'do not disturb' signs being constantly hung on doors," as well as "*women* arriving to hotels and being checked in with their trafficker with little to no personal possessions; *women* arriving with signs of physical abuse; [and] *women* arriving at the hotel who appear fearful or anxious."  (*See* ECF No. 96, PageID.1147).  These allegations refer to "women" generally and do not specify whether any of these things occurred directly with K.O. at any of the ESA locations.  *See H.G.*, 489 F. Supp. 3d at 705 ("these allegations that Defendants were generally aware of sex trafficking in the hotel industry and at some properties operating under their brand names fall short of establishing that Defendants knew or should have known of sex trafficking *by the ventures in which they purportedly participated.*") (emphasis in original).

K.O.'s only allegations directly implicating these hotels are that, at some point over a span of 11 years, "a man visiting from another country…would call the hotel asking for Plaintiff" and the employees would recognize her.  (ECF No. 96, PageID.1193).  While she also claims she "had to go to a front desk clerk for help on more than one occasion," she does not detail which hotel or hotels this occurred at or what type of "help" she sought, and she does not suggest there were any explicit signs that would have suggested to the staff that she was being

trafficked "using means of force, threats of force, fraud, coercion."  18 U.S.C.

§ 1591.  This can be directly compared to her allegations against Defendant

Farmington Hospitality, where she describes an incident "where her trafficker

beat her…breaking several of her bones," and she "begged hotel staff to give her

a phone to call her brother," meaning she likely would have been exhibiting clear

signs of physical abuse.  While the provided facts may have allowed staff the ESA-

branded hotels to guess or assume that K.O. was associated with sex trafficking,

they are insufficient to indicate that staff "should have known" of this specific

trafficking venture.  *See G.G.*, 76 F.4th at 557 ("to allow allegations that a civil

defendant was aware of sporadic sex trafficking in low-budget hotels generally to

show constructive knowledge of a particular sex trafficking venture 'unjustifiably

bridges the scienter gap between should have known and might have been able

to guess.'") (internal quotation marks omitted); *L.H.*, 2023 WL 5725574, at *7

("When courts have permitted direct liability claims to proceed, they were

presented with stronger facts 'connecting the dots' than those presented here.").

Because she has failed to plausibly allege both the second and third factors of this

test, her claim brought under a direct liability theory against Defendant ESA

Management must fail as a matter of law.

## V.    CONCLUSION

The court recognizes the deeply horrifying nature of the alleged sex trafficking and assault K.O. suffered over the course of over 10 years.  However, the court nevertheless must ensure her claims against the many Defendants "contain[] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 677.  Even viewing the facts in the light most favorable to K.O., the court finds she has failed to state a direct or indirect liability claim under the TVPRA against Defendants G6, Warren Economy, Marriott, Knights, Namou, Holiday Hospitality, Southfield, ESA Management, and Red Roof.  As such, Defendants' motions to dismiss are **GRANTED IN PART** as they relate to the claims against these Defendants only.  As stated above, the court finds K.O. has sufficiently stated a claim against Defendant Farmington Hospitality, and the Defendants' motions to dismiss are **DENIED** as they relate to these claims.  Plaintiff's case may continue as to Defendant Farmington Hospitality only, and her claims must be limited to those that fall within the relevant statute of limitations.

**SO ORDERED**.

Date: March 31, 2024            s/ F. Kay Behm
                                F. Kay Behm
                                United States District Judge